WOODWARD ET AL., APPELLANTS, *v.* PERKINS ET AL., RESPONDENTS.

(No. 8405.)

(Submitted November 15, 1943. Decided April 15, 1944.)

[147 Pac. (2d) 1016.]

48

*Messrs. W. E. Keeley, James B. Castles* and *Maurice J. Mac-Cormick,* for appellants, submitted a brief; *Mr. Keeley* argued the cause orally.

*Mr. S. P. Wilson,* for respondent, submitted a brief and argued the cause orally.

MR. JUSTICE ANDERSON delivered the opinion of the court.

This appeal involves the right to the use of water taken from a stream which is the source of supply for irrigation to a large number of land owners. The case was tried to the court without a jury. Findings were made and judgment was entered thereon for the defendants. The appeal is from the judgment.

The action was brought by appellants to restrain the respondent Perkins from taking and using water flowing in Dempsey Creek and which is diverted by ditch and used upon his land for irrigation. Dempsey Creek is the common source of water supply of the appellants and respondent. All are land owners and water users in the area and have established water rights on the creek. The complaint is that respondent encroaches upon the rights of appellants in that he takes from the stream more water than he is entitled to have under his water right and which results in leaving appellants short of water to which they are entitled. This the respondent denies. He claims that the water which he takes and about which there is complaint he has reduced to possession in the upper reaches of the stream when not needed for irrigation and that it is property of his own; that it has no relationship to the general flow of water in the

stream from which users, under established water rights, get their supply.

Dempsey Creek is a natural stream of water rising in the mountains on the west side of Deer Lodge Valley and flowing generally in an easterly direction and emptying into Deer Lodge River. The stream forks up above, dividing into the North Fork, Middle Fork and South Fork. The South Fork is the main part of the stream. The Middle Fork is a branch of the North Fork uniting a little less than a mile above the juncture of North Fork and South Fork.

Respondent owns part of section 31 and all of sections 32 and 33, the area in which the three forks of the stream come together. Other water users own land farther downstream, along its entire course to where it empties into Deer Lodge River, a distance of about twelve miles.

The North Fork flows almost directly south through section 32, respondent's land, and a little to the east of the mid-section line, making junction with the South Fork near the south boundary line of the section. It is above the juncture and between the two forks of the stream that respondent has his system for capture of water.

Along the west side of North Fork and at about the center point of section 32, the ground rises precipitously from the creek level to a height of about 200 feet and forms the base of a plateau which extends back to the higher stream levels in the foothills. On top of this plateau and near the North Fork are several natural depressions which are spoken of as ''pot holes.'' In these depressions, water collects from rains and snow but is not held for any length of time except in the largest one. The plateau ground is of glacial moraine and porus and the water sinks quickly into it from the pot holes. The largest depression, which is designated as pot hole No. 1, does retain water up to a certain level with a surface area of about three acres. This pot hole has fish in it and there is other evidence that there is some water in it the year around.

At times of high water and at times of year when not needed

for irrigation, respondent diverts water by ditches from the forks of the stream up above and into four of these pot holes for conservation and use, for irrigation on his land in the valley below. These pot holes, which include the large one described, vary in size from 2 to 6 acres high-water surface area and are about eight feet deep. What becomes of the water after it sinks away from the pot holes is not known. Below the base of the plateau and along the creek, water seeps out of the ground and drains into the creek. The straight-line distance from the four pot holes down to this seepage area varies from 400 to 800 feet. Here, along the stream and parallel to it, the respondent has two drain ditches about a foot and a half wide and a foot deep—one 246 feet long and the other 178 feet long. In these ditches he intercepts and collects seepage water as it drains toward the creek. The water so gathered is measured as it runs into the creek and an equal quantity less allowance for waste is diverted from the creek at a point below and carried by ditch to respondent's land. Respondent contends that this seepage which he collects and measures into the stream is from the water he places in the pot holes on the plateau above; that it finds its way by percolation down through the base of the plateau and into the bottom land along the creek where it seeps out in its downward course. The contention is that by this system of capture the water comes into possession and control of respondent as his property.

In 1892 the waters of Dempsey Creek, the entire Dempsey Creek system, were adjudicated by court decree which counsel refer to as the 404 decree, the court number of the case. The appellants are all land owners and water users within the Dempsey Creek system with water rights established by that decree. Respondent Perkins likewise holds water rights under the 1892 decree. Two other water decrees have been entered later but neither of these grants any additional right or establishes any regulation which is of concern in the present case. A decree in 1902 made adjustments between certain of the rights under the earlier decree. In 1921 Perkins had a decree entered

for the establishment of the water right here in question. That decree is of no binding effect on any of the appellants here. None of them, nor any of their predecessors in interest, was made party to the action. There was only the one defendant and the only effect which the decree could have was in the adjustment of claimed rights as between the two litigants and those claiming under them. That decree is therefore of no consequence· in the determination of any of the issues here presented.

The 1892 decree covers all the waters of Dempsey Creek, the main stream and all tributary flow. The water here in controversy is taken from the main stream below the confluence of the two forks. As already stated, appellants contend that it is Dempsey Creek water covered by the 1892 decree. Respondent contends that, while it is Dempsey Creek water, it is an additional flow in the irrigation season which is produced by his system of capture and delayed flow; that its diversion from the forks of the stream is done at times of excess flow or outside of the irrigating season and when it is not needed to fill the requirements of the water users having rights under the court decree. The contention is that the water would otherwise go unused and flow into Deer Lodge River. Appellants claim their water rights are infringed upon and ask relief by injunction.

The respondent by his cross-complaint, which sets forth the same controversial facts as does the complaint, claims that it shows him to have a new and additional water right and which he asks the court to establish by decree, and on which he relies also as a defense to the plaintiffs' suit. The entire case before us hinges upon that question and the adjudication of that claim will dispose of the whole controversy.

To show that such water right has been acquired, a number of facts must be proved. They must be established by satisfactory evidence and the burden of proof is on the claimant. (*Beaverhead Canal Co.* v. *Dillon Electric Light & Power Co.*, 34 Mont. 135, 85 Pac. 880; *Smith* v. *Duff*, 39 Mont. 382, 391,

102 Pac. 984, 193 Am. St. Rep. 587; *Spaulding* v. *Stone,* 46 Mont. 483, 129 Pac. 327.)

Respondent's claim is that, by his system of diversion and delay in the flow as already described, he has produced an increase of water available for irrigation and that to the extent of such increase he is entitled to additional water right.

If respondent had a system of canals and reservoirs that would in fact capture and hold water, he would have a legitimate basis for his claim. That was the plan in mind when the scheme was first initiated. It was thought that the pot holes would hold water and could be used as reservoirs. It was found, however, that the water put in them all sank quickly into the ground. Then it was thought the disappearing water would, after being held in suspense in the underground of the plateau, find its way to lower ground level. Seepage water was found in the area below and respondent concluded that his water from the pot holes must be there. This led to the digging of the drain ditches for the measuring of the seepage before its flow into the stream. The claim is that the measured water is respondent's water from the pot holes.

The defect in the system of capture and "reservoiring", as respondent calls it, is that upon depositing the water in the pot holes it soon thereafter disappears entirely and mingles with and becomes a part of the earth below. When that happens, it loses its character as flow water and is no longer subject to the regulations of law which govern while it is capable of direction and control. Its identity and its ownership then become the same as that of the soil of which it forms a part. (*Ryan* v. *Quinlan,* 45 Mont. 521, 532, 124 Pac. 512.) The purpose and history of its previous attempted appropriation has no bearing upon its status. If seepage thereafter forms from the saturated ground, the water thereby produced is subject to the same rules as to appropriation as is any seepage from one's land.

The question as it here arises has not heretofore come before this court but opinions in cases involving related problems give support to the conclusion we have reached. (*Ryan* v. *Quinlan,*

supra; *Galigher* v. *McNulty*, 80 Mont. 339, 270 Pac. 401; *Rock Creek Ditch & Flume Co.* v. *Miller*, 93 Mont. 248, 17 Pac. (2d) 1074, 89 A. L. R. 200.

The uncertainty there must be in any attempt at tracing such dispersed water is readily seen, and the present case is an example. Here it was sought by witnesses to prove a changed condition in the seepage area below after respondent's use of the pot holes. Some men, well along in years, testiifed as to their recollection of the condition there fifty years ago and in years following. Others described the condition in more recent years. There was much conflict in this evidence. Recollections of such things we would expect to be more or less hazy. There was no proof of any course of percolation which the water followed nor of any impervious strata in the plateau base which would deflect the water in any direction. The evidence shows that the North Fork was fed all along its course by springs and seepage from the adjoining land which adds to the uncertainty of the source of any of the seepage. To establish property rights on proof such as was here relied on would be the accepting of speculation as sufficient basis.

This court, by a series of decisions, has adhered to the view that the ownership of land where water has its source does not necessarily give exclusive right to such waters so as to prevent others from acquiring rights therein. (*West Side Ditch Co.* v. *Bennett*, 106 Mont. 422, 78 Pac. (2d) 78.)

Seepage water which has its rise along the bed of a stream and forms a natural accretion thereto belongs to that stream as part of its source of supply, same as feeder springs. An appropriator on the stream has the right to all such tributary flow even as against the owner of the land. This is the general rule supported by court decisions in a number of states. (Annotations in 89 A. L. R. 218.) The decision of this court in *Beaverhead Canal Co.* v. *Dillon Electric Light & Power Co.*, supra, which has been repeatedly referred to with approval, is to that effect. In Colorado, a statute gives the person on whose lands seepage or spring waters first arise the prior right and use

thereof on his lands. This statute has been construed as applying where the waters form no part of a natural stream; where they are naturally tributary to a stream, they do not belong to the land owner, regardless of the statute, but are subordinate to the stream appropriations. (*Nevius* v. *Smith*, 86 Colo. 178, 279 Pac. 44.)

The respondent therefore accomplished nothing by his diversion of water into the pot holes nor by measuring the flow of seepage entering the stream. The evidence is wholly inadequate to support the finding that an additional flow in the stream had been created and without which there is no support of the decree granting the additional water right.

Respondent makes the further contention of right by prescription resulting from thirty years user of the water in controversy. In order to acquire a prescriptive right, it is necessary that the user be detrimental to the one whose title and rights are said to have been destroyed. Here respondent affirmatively states and predicates his claim of right upon the fact that his use of water in no way lessens the source of water supply for the decreed rights and in no way tends to destroy the rights of the other water users. (Kinney on Irrigation and Water Rights, pages 1875-1894.) Furthermore, respondent claims water right under the 1892 decree to which his predecessor in interest was a party, and he is estopped from claiming any right by prescription as against any of the rights established by that decree. (*Campbell* v. *Wyoming Development Co.*, 55 Wyo. 347, 100 Pac. (2d) 124, 138, 102 Pac. (2d) 745.) Respondent has failed to show title by prescription.

The judgment and decree of the lower court is reversed. The cause is remanded with direction to enter a decree for the plaintiffs adjudging void defendant's claim to an additional water right as set forth in his cross-complaint and restraining him from asserting any claim of right based on such cross-complaint.

MR. CHIEF JUSTICE JOHNSON and ASSOCIATE JUSTICE ADAIR concur.

MR. JUSTICE MORRIS:

I dissent. The defendant Perkins was entirely within his rights when he diverted the excess waters from Dempsey Creek into his pot holes. (Sec. 7093, Rev. Codes; *Rock Creek Ditch & Flume Co.* v. *Miller,* 93 Mont. 248, 259, 17 Pac. (2d) 1074, 89 A. L. R. 200.)

Again he was within his rights when he recaptured the water in his drain ditches. It was percolating water under his own land. (*Rock Creek Ditch & Flume Co.* v. *Miller,* supra; *Ryan* v. *Quinlan,* 45 Mont. 521, 124 Pac. 512; *Spaulding* v. *Stone,* 46 Mont. 483, 129 Pac. 327; *Wills* v. *Morris,* 100 Mont. 514, 536, 50 Pac. (2d) 862.) And he recaptured it before it escaped from his lands. The water commissioner measured the volume from the drain ditches into Dempsey Creek and measured it out farther down the stream where it was taken out through ditches to defendant's lands, less not more than ten per cent being allowed for loss while flowing in the channel of the stream. In that he was again within the law and his rights. (Sec. 7096, Rev. Codes; *State ex rel. Mungas* v. *District Court,* 102 Mont. 533, 539, 59 Pac. (2d) 71.) The only question in the whole proceeding about which there can be any doubt is as to whether or not the waters that escaped by seepage from the pot holes and were recaptured in defendant's drain ditches were the same waters that the defendant had impounded in such pot holes, and a clear preponderance of the evidence sustains the findings of the trial court that they were the same waters. Under the general rule, upheld by this court in a long line of decisions, the judgment of the lower court should be affirmed. (*Wills* v. *Morris,* supra, and cases cited.)

MR. JUSTICE ERICKSON:

I concur in the above dissenting opinion of MR. JUSTICE MORRIS.

Rehearing denied May 5, 1944.